UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| STRATO, INC.<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA<br><br>　　　　　　Defendant. | COURT NO.: 22-00315 |

## COMPLAINT

Strato Inc., (hereinafter "Strato" or "Plaintiff"), by and through its attorneys, Givens & Johnston, PLLC, for its complaint against the United States alleges as follows:

### PARTIES

1.　　This action concerns Strato's importation of SCUs from Mexico into the United States. Strato is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business in Piscataway, New Jersey. Strato manufactures Selective Cushioning Units ("SCUs") and other products with applications in the railroad industry.

2.　　Defendant United States, through United States Customs and Border Protection ("CBP"), is charged with administering the tariff classification of merchandise imported into the United States under the *Harmonized Tariff Schedule of the United States* ("HTSUS") and collecting duties on such merchandise. Any reference to Headings, Subheadings, Section or Chapter Notes, hereinafter, refers to those contained in the HTSUS.

### JURISDICTION

3.　　This Action arises under Section 514 of the Tariff Act of 1930 as referenced in

1

1581 (19 U.S.C. § 1514(a)(3)) and contests certain charges or exactions within the jurisdiction of the Secretary of the Treasury imposed by CBP upon Strato as a condition of importation of one of the SCU's described above.

4. Strato entered the SCU at the Port of Brownsville, Texas on September 3, 2022, under consumption entry number 480-2498997-9.

5. Strato paid the duties imposed by CBP as a condition of the entry (including the contested charges or exactions).

6. On September 16, 2022, Strato filed Protest # 2301-22-30057 to protest the charges or exactions in accordance with 19 U.S.C. § 1514. Strato requested Accelerated Disposition of the Protest.

7. CBP's failure to decide the Protest within 30 days of its filing rendered a denial by operation of law on October 16, 2022.

8. Strato has standing to bring this Action pursuant to 28 U.S.C. § 2631(a) because its Summons was filed under 19 U.S.C. § 1514 to contest the denial of a Protest of the charges or exactions of Strato's SCU's entry, which is the subject of this Action.

9. This Court possesses exclusive jurisdiction of the Action under 28 U.S.C. § 1581(a) because this Civil Action was commenced to contest the denial of a protest under 19 U.S.C. § 1514.

10. In accordance with 28 U.S.C. § 2636(a), this Action to contest the denial of the Protest was timely commenced under 19 U.S.C. § 1514 within 180 days after the date of denial of the Protest.

**THE MERCHANDISE**

11. The SCU consists of the combination of a "draft pack" which is designed to absorb tension and provide cushioning as freight cars pull apart, and a "buff pack" which is designed to compress and thus to absorb or cushion the load when the freight cars come together to form a string of railcars.

12. The draft pack, with an approximate weight of 548 pounds, consists of a large steel casing, elastomer buffer pads, and steel plates.

13. The buff pack, with an approximate weight of 522 pounds, is composed of elastomer buffer pads and steel plates.

14. As noted, the primary components of the SCU buff and draft packs are 1) various steel plates and other components (which are expected to be sourced from various 3rd countries, including China) and 2). elastomer buffer pads of U. S. origin, which are imported from the United States into Mexico. All of the components undergo a complex assembly process in Mexico.

15. The assembly of the buff packs consists of multiple stations using special purpose hydraulic/pneumatic presses with an assembly stand, custom assembly jigs, roller conveyors between stations, an overhead crane with a lifting magnet, and a specialized semi-automatic welding station.

16. During this assembly process for the buff pack, alternating steel plates and elastomer buffer pads are vertically stacked around the shaft of a threaded bolt that runs through the center of the stack on the custom assembly jig. Once fully stacked, professionally trained workers move the uncompressed stack to the hydraulic/pneumatic press where it is exposed to nearly 700,000 PSI of pressure.

17. The compression changes the height of the stack and positions the elastomer pads

between the steel plates in a fixed state of compression.

18. Lastly, the stack is moved to the welding station where it lays horizontally and a nut is added, torqued, and welded to maintain the prescribed 30,000 PSI of pressure.

19. The draft pack assembly process also consists of multiple stations including another special-purpose electro-mechanical and hydraulic press, custom assembly jigs, roller conveyors, and an overhead crane with lifting magnet.

20. The draft pack assembly begins by vertically stacking alternating steel plates and elastomer buffer pads on the custom assembly jig where it is centered by protrusions embedded in the steel plates.

21. The uncompressed stack is then repositioned inside the electro-mechanical and hydraulic press where nearly 400,000 PSI of pressure is applied to attain the necessary height and compression. Finally, the compressed stack is placed inside the yoke (steel casing) where it maintains the required 30,000 PSI of pressure.

22. Lastly, to create the SCU, the draft pack and buff back are installed in a railcar as one component that is held by a steel casing.

23. In refining the SCU assembly process, Strato has invested years of R&D as well as roughly $650,000 to develop and construct the machinery used in the assembly.

## **BACKGROUND**

24. On November 19, 2021, Strato filed a request for a ruling addressed to U. S. CBP, Headquarters of Regulations and Rulings, Attn: Valuation and Special Programs Branch, 799 9th Street, NW Washington D.C, as to the SCUs to be manufactured in Mexico and imported directly thereafter into the United States. It requested the tariff classification, country of origin for marking

purposes, applicability of the USMCA, and the applicability of Section 301 Chinese tariffs on the steel plates.

25. Strato requested CBP to rule that the complex assembly in Mexico effected a substantial transformation of the foreign steel plates for the reasons stated above, and as such that they were no longer subject to Section 301 duties.

26. Following considerable discussion and exchange of information, Customs Headquarters issued its unfavorable ruling, HQ H322364, to Strato on June 3, 2022.

## CHARGES OR EXACTIONS

27. The merchandise subject to the protest at issue consists of a SCU produced by Strato and sold to the railway industry in the United States and abroad.

28. The Protest alleges that the compulsory overpayment of duties imposed on the SCU by ruling No. HQ H322364 constitutes a charge under 19 U.S.C. § 1514(a) because they resulted from CBP's incorrect country of origin determination re the steel in response to Strato's ruling request, resulting in the payment of higher duties upon importation from Mexico into the United States where the steel plates were of Chinese origin.

29. The Court of International Trade (CIT) has held that in order to constitute a charge or exaction, "there would have to have been some compulsion on the part of Customs requiring plaintiff to have paid the moneys". *Carlingswitch, Inc. v. United States*, 500 F. supp 223, 227 (Ct. of Int'l Trade 1980).

30. The CIT has defined the term "charge" as "encompass[ing] a broad range of meanings including: an obligation or duty, a liability, an expense or the price of an object; an entry in account of what's due from one party to another". *Borusan Mannesmann Boru Sanayi Ve Ticaret*

*A.S. & Gulf Coast Express Pipeline, LLC v. United States*, 578 F. Supp. 3d 1333, 1341 (Ct. Int'l Trade 2022).

31. The overpayment of these duties are charges as they were involuntary because Strato had to pay the duties for their merchandise to clear Customs.

32. The terms charges or exactions have "been applied to actual assessments of specific sums of money (other than ordinary customs duties) on imported merchandise. *Alberta Gas Chems. V. Blumenthal*, 82 Cust. Ct. 77, 82 (U.S. 1979).

33. 301 duties are not ordinary because they originated outside CBP. Like the exceptions to Countervailing and Antidumping duties found in 22 U.S.C. § 1360(a)(3)(B) and (C) due to promulgation via the International Trade Administration, the decision to promulgate the 301 duties originated outside of Customs via the United States Trade Representative (USTR) in a multiagency process.

34. The duties imposed on Strato by Customs are not "ordinary customs duties" within the meaning of 22 U.S.C. § 1360(a)(3) because the additional 25% *ad valorem* 301 duties are extraordinary trade remedies. Ruling No. HQ H32264 effectively imposed a 28.6% ad valorem duty rate (3.6% from the HTSUS 8607.30.1000 classification of the steel components and 25% from the Section 301 trade remedies) on Strato.

## CBP RULING NO. HQ H322364

## CLASSIFICATION AND DUTIES

35. On November 19, 2021, Plaintiff's counsel filed a ruling request concerning the classification, country of origin, and USMCA eligibility of the SCU.

36. Plaintiff's counsel suggested that the proper classification for the assembled SCU to be under HTSUS 8607.30.1000 with an applicable duty rate of 3.6% *ad valorem*.

37. On June 3, 2022, CBP issued Ruling No. HQ H322364 to Strato.

    a. This ruling concerned the classification, country of origin and substantial transformation of the SCU, and USMCA eligibility.

    b. In issuing ruling No. HQ H322364, CBP agreed with Plaintiff that the finished draft packs and buff packs are classified in HTSUS subheading 8607.30.1000, and that the bolt and nut are classified in HTSUS subheading 7318.15.

    c. However, CBP did not agree with plaintiff's classification of the steel plates and yokes under 7325.99.5000 as "other cast articles of iron or steel, other, other, other," and instead, ruled that the steel plates and draft yoke are parts of buffers classified in subheading 8608.30.10, HTSUS.

38. CBP deemed the steel plates and draft yokes parts of buffers because it applied the test to determine whether an imported item is classified as a part. An item is classified as such if it is (1) an "integral, constituent, or component part, without which the article to which it is joined, could not function as such article" OR (2) "dedicated solely for use with another article." *Brother International Corporation v. United* States, 26 CIT 867 (2002). CBP reasoned that because the plates and draft yoke were "specifically designed for use in the draft packs and buff packs and [are] essential to the production and use of [the SCU], the plates and draft yoke are parts of buffers," and as such are classified under subheading 8607.30.10, HTSUS.

## COUNTRY OF ORIGIN

39. CBP held that the country of origin for the fully assembled SCU is the country of origin that the steel plates come from. CBP reasoned that the steel plates are "greater in volume and visibility in the finished good," and therefore, they impart the essential character to the draft and buff packs. CBP ignored the fact that "the steel plates and elastomer pads work together to

7

provide the cushioning function of the draft packs and buff pack," and found that the steel plates impart the essence of the Selective Cushioning Unit instead of the stacked elastomer pads because they "predominate in weight, volume, and size."

40. Furthermore, Plaintiff requested an alternative in issuing ruling No. HQ H322364: if CBP found that no substantial transformation took place in Mexico after the imported materials underwent a complex assembly process, then the "origin of the draft packs and buff packs should be the country of origin of the elastomer pads as [Plaintiff] believe[s] the elastomer pads impart the essential character to the draft packs and buff packs", because the purpose of the SCU is to buffer and cushion to prevent damage to the rails cars as they pull apart and come together

41. Despite overwhelming evidence, CBP disagreed and found that the steel plates are equally essential to "absorb and dissipate force when applied to the rail car through the coupler."

## SUBSTANTIAL TRANSFORMATION

42. Additionally, in issuing ruling No. HQ H322364, CBP found that no substantial transformation took place in Mexico after the imported materials underwent a complex assembly process.

43. CBP's finding that no substantial transformation took place turned on whether there was substantial transformation when the pressurization of the components took place in Mexico.

44. CBP did not agree that the specialized assembly that "can only be assembled on two special, purpose-built and patent pending presses," which "apply the pressure necessary… to finally end with ca. 30,000 PSI pressure, a preload of which is required to enable the resultant product to perform its function of providing the necessary tension and resistance, while not

excessively compressing, extending, or bending any of the components in operation as railcar connectors".

45. CBP reasoned that because "the individual components are imported into Mexico with a pre-determined end use" and while they undergo a molecular restructuring pressurization process, the "elastomer pads and the steel plates do not lose their individual identities as pads and plates". CBP further reasoned that because there is no indication that the lower pressurization levels that the steel plates and draft packs are subjected to affecting their molecular structure, that "all of the separate components retain their individual identities.

## USMCA ELIGIBILITY

46. CBP held that there was no USMCA eligibility for the fully assembled SCU. CBP applied GN 11(b)(iii) which states "the good is a good produced entirely in the territory of one or more USMCA countries using non-originating materials, if the good satisfies all applicable requirements set forth in this note (including provisions of subdivision (o))."

47. CBP analyzed the tariff shift rule set out in GN 11 (o):

"(A) A change to subheading 8607.30 from any other heading; or

(B) No change in tariff classification to a good of subheading 8607.30, provided there is a regional value content of not less than:

(1) 60 percent where the transaction value method is used; or

(2) 50 percent where the net cost is used."

48. CBP reasoned that because they "determined that the yoke and steel components are classified as parts of buffers in subheading 8607.30, HTSUS, the draft packs and buff packs do not meet the requirements of part A of the tariff shift rule." Additionally, CBP stated that based

on the cost and value information provided, the regional content value threshold in part B was not met.

49. As a result of Ruling No. HQ H322364, Strato's imported SCU was partially classified as "Parts of railway or tramway locomotives or rolling stock: Hooks and other coupling devices, buffers, and parts thereof: For vehicles of heading 8605 or 8606" and assessed with an additional Section 301 25.0% duty rate *ad valorem*.

50. Plaintiff claims that in issuing Ruling No. HQ. H322364, CBP incorrectly came to the conclusion that no substantial transformation took place in Mexico because some of the components had a pre-determined end use. Alternatively, Plaintiff also claims that in issuing Ruling No. HQ H322364, CBP incorrectly applied the essential character test to determine the country of origin of the SCU turned on the origin of the steel plates

### **COUNT I- A SUBSTANTIAL TRANSFORMATION TOOK PLACE IN MEXICO DESPITE THERE BEING A PRE-DETERMINED END USE**

51. Paragraphs 1 through 49 are repeated with the same force and effect as if fully stated herein.

52. A substantial transformation occurs "when an article emerges from a manufacturing process with a name, character, or use which differs from those of the original material subjected to the process." *Torrington, Co. v. United States*, 764 F.2d 1563, 1568 *(Fed. Cir. 1985)* (citing *Texas Instruments, Inc. v. United States*, 681 F.2d 778, 782, 69 C.C.P.A. 151 *(C.C.P.A. 1982))*.

53. The substantial transformation test is applicable when determining the country of origin for the purposes of applying trade remedies under Section 301(b) of the Trade Act of 1974.

54. Substantial transformation determinations are fact specific and made on a case-by

case basis. *Cyber Power Sys. (USA) Inc. v. United States*, 560 F. Supp. 3d 1347, 1350 (Ct. Int'l Trade 2022). The test is a disjunctive test; only a change in one of the three criteria—name, character, or use –is required. *Id.*

55.    Furthermore, when "the post-importation processing consists of assembly, courts have been reluctant to find a change in character, particularly when the imported articles do not undergo a physical change" *Energizer Battery, Inc. v. United States*, 190 F. Supp. 3d 1308, 1318 (2016). Additionally, the court has acknowledged that "when the end-use was pre-determined at the time of importation, courts have generally not found a change in use". *Id.* at 1319.

56.    The court in *Cyber Power* clarified the limitations on "predetermined end use" as it relates to substantial transformation. "The fact that there was only one predetermined use of the imported article does not preclude the finding of substantial transformation." (Citing *Torrington, Co. v. United States*, 764 F.2d 1563 (Fed. Cir. 1985)).

57.    Because there is a new name, character, and use of the imported articles, there is a substantial transformation.

58.    Because the articles are no longer referred to by their individual names, such as "steel plates with elastomer buffers", but as an "SCU", there is a substantial transformation.

59.    Because the steel plate, elastomer pads, and the yoke/steel housing all become permanently attached to the SCU through the high compression, welding, and configuration by professional trained workers to keep the SCU at a constantly compressed state, there is a substantial transformation.

60.    Because there is a change in use of the imported articles upon the complex assembly in Mexico, there is a substantial transformation.

61.    Because either a change in name, character, or use occurs during the post

importation assembly in Mexico, there is a substantial transformation.

62. By application of the substantial transformation test and the Cyber Power rationale, the subject SCU's were substantially transformed in Mexico.

### COUNT II- ALTERNATIVELY, THE ELASTOMER PAD IMPARTS THE ESSENTIAL CHARACTER OF THE SCU'S AND AS SUCH, THE COUNTRY OF ORIGIN IS THE UNITED STATES.

63. Paragraphs 1 through 49 are repeated with the same force and effect as if fully stated herein.

64. If no substantial transformation is found to occur in Mexico, then the country of origin hinges upon the article that imparts the essential character of the buff packs and draft packs.

65. 19 C.F.R. §102.1(b) states that the USMCA origin of the product is the origin of the part that imparts the essential character.

66. General Rule of Interpretation ("GRI") 3(b) of the HTSUS, gives insight as to find the essential character and states:

> Mixtures, composite goods consisting of different materials or made up of different components, and goods put up in sets for retail sale, which cannot be classified by reference to 3(a), shall be classified as if they consisted of the material or component which gives them their essential character, insofar as this criterion is applicable.

67. The essential character inquiry is factual in nature . . . [and] involves weighing a number of diverse factors." *Structural Indus., Inc. v. United States*, 356 F.3d 1366, 1370 (Fed. Cir. 2004).

68. The "factor which determines essential character will vary as between different kinds of goods" and "may, for example, be determined by the nature of the material or component, its bulk, quantity, weight or value, or by the role of a constituent material in relation to the use of

the goods." Explanatory Notes to GRI 3(b). *See also Alcan*, 929 F. Supp. 2d at 1348 (quoting Explanatory Notes to GRI 3(b)), *aff'd*, *Alcan*, 771 F.3d at 1364.

69. No single, objective factor determines essential character. The "primary function of an article may also be the basis for a determination of essential character. *3G Mermet Fabric Corp. v. United States*, 25 CIT 174, 181, 135 F. Supp. 2d 151, 159, SLIP OP. 2001-28 (2001).

70. The "essential character" of an article is "that which is indispensable to the= structure, core or condition of the article, i.e., what it is." *Home Depot USA, Inc. v. United States*, 30 CIT 445, 460, 427 F. Supp. 2d 1278, 1293, SLIP OP. 2006-49 (2006), *aff'd*, 491 F.3d 1334 (Fed. Cir. 2007) (citing *A.N. Deringer, Inc. v. United States*, 66 Cust. Ct. 378, 383, C.D. 4218 (1971)).

71. Because the elastomer pads have undergone a molecular restructuring to enable them to remain in a constant state of compression capable of sustaining additional compression, they impart the essential character to the SCU.

72. Due to the fact that the elastomer pads allow the SCU to function as a freight railcar buffer system, they impart the essential character.

73. Based on the action performed by the stack of elastomer pads (absorbing an dissipating force), the elastomer pads impart the essential character.

74. Due to the fact that the elastomer pads impart the essential character and are imported from the United States into Mexico, the country of origin is the United States.

75. By application of 19 C.F.R. §102.1(b) and GRI3(b), the article that imparts the essential character to the subject SCU is the elastomer pad, and as such the country of origin is the United States.

## **REQUEST FOR JUDGMENT AND RELIEF**

76. WHEREFORE, Plaintiff requests the Court to enter judgement in favor of the Plaintiff, holding that (1) a substantial transformation of the draft packs and buff packs components of the SCU took place in Mexico despite there being a pre-determined end use for the components; (2) alternatively, that the elastomer pads impart the essential character to the draft packs and buff packs and as such the country of origin of the draft packs and buff packs are the country of origin of the elastomer pads; (3) CBP is ordered to correct the subject entry and issue refunds of excess Customs duties and fees assessed and paid, with interest as provided by law; and (4) Plaintiff is granted such other relief as the Court deems just and appropriate.

Dated: November 3, 2022

Respectfully submitted,

/s/ Robert T. Givens
Robert T. Givens
GIVENS & JOHNSTON, PLLC
950 Echo Lane, Suite 360
Houston, Texas 77024
*Counsel to Strato*

# CERTIFICATE OF SERVICE

Pursuant to U.S. Court of International Trade Rule 4(b) and (h), I hereby certify that on November 3, 2022, copies of Plaintiff's Complaint were served on the following parties by electronic service via PACER upon:

**Edward Francis Kenny**
U.S. Department of Justice
Commercial Litigation Branch – Civil Division
26 Federal Plaza
Room 346
New York, NY 10278

**Attorney-in-Charge**
U.S. Department of Justice
International Trade Field Office
26 Federal Plaza – Room 346
Civil Division
New York, NY 10278

**CBP Assistant Chief Counsel**
U.S. Department of Homeland Security
International Trade Litigation
U.S. Customs and Border Protection
26 Federal Plaza – Room 258
New York, NY 10278

/s/ Robert T. Givens
Robert T. Givens
